UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
BETH MALENOVSKY,

                        Plaintiff,

        - against -

FARMINGDALE STATE COLLEGE, STATE
UNIVERSITY OF NEW YORK and DANIEL
DAUGHERTY, FRANK CAPEZZA,
ZACHARY LEE, JOSEPH TRINGALI, and
ANDREW KALOS, individually,

                        Defendants.
----------------------------------------------------------X

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff, Beth Malenovsky, by and through her attorneys, LEEDS BROWN LAW, P.C., alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This is a civil action based on the Defendants' violations of Plaintiff's rights as guaranteed to her by the Fourteenth Amendment of the United States Constitution, as enforced by 42 U.S.C. § 1983 ("Section 1983"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and any other cause of action which can be inferred from the facts set forth herein.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343. Supplemental jurisdiction is invoked over State causes of action pursuant to 28 U.S.C. § 1367.

3.    Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

4.    All conditions precedent to maintaining this action have been fulfilled.  On August 23, 2022, a complaint was filed with the New York State Division of Human Rights ("NYSDHR"), which was dual-filed with the EEOC.  On May 25, 2023, the NYSDHR rendered a Probable Cause Determination.  On September 25, 2024, the NYSDHR dismissed the matter for administrative convenience.  On November 20, 2024, the EEOC issued a right to sue letter. This action was properly instituted within 90 days of the receipt of said letter.

**PARTIES**

5.    Plaintiff, Beth Malenovsky ("Beth"), a female, was and remains a resident of the County of Suffolk, State of New York.

6.    Defendant, Farmingdale State College, State University of New York ("College") is a public college that is part of the State University of New York system.   The College operates a University Police Department ("Department") which employed Plaintiff.

7.    Defendant, Daniel Daugherty (Daugherty"), upon information and belief, was and remains a resident of the County of Suffolk, State of New York.  Daugherty was and is the Chief of the Department.  As Chief, Daugherty has final authority to assign work responsibilities, bring disciplinary charges, transfer employees, and set policies.  Accordingly, he is a supervisor under

the applicable laws.  Further, he is an employer under the applicable State Laws.  Daugherty was aware of and remained deliberately indifferent to the unlawful conduct as set forth herein.


8.  Defendant, Frank Capezza ("Capezza"), upon information and belief, was and remains a resident of the County of Suffolk, State of New York.  Capezza was and is the Assistant Chief of the Department.  As Assistant Chief, Capezza has final authority to assign work responsibilities, bring disciplinary charges, transfer employees, and set policies.  Accordingly, he is a supervisor under the applicable laws.  Further, he is an employer under the applicable State Laws.  Capezza was aware of and remained deliberately indifferent to the unlawful conduct as set forth herein.


9.  Defendant Zachary Lee ("Lee"), upon information and belief, was and remains a resident of the County of Suffolk, State of New York.  Lee was and a Lieutenant in the Department.  As a Lieutenant, Lee had final authority to assign work responsibilities, bring disciplinary charges, transfer employees, and set policies.  Accordingly, he was a supervisor under the applicable laws.  Further, he was an employer under the applicable State Laws.  Lee was aware of and remained deliberately indifferent to the unlawful conduct as set forth herein.


10.  Defendant Joseph Tringali ("Tringali"), upon information and belief, was and remains a resident of the County of Suffolk, State of New York.  Tringali was and is a Lieutenant in the Department.  As a Lieutenant, Tringali has final authority to assign work responsibilities, bring disciplinary charges, transfer employees, and set policies.  Accordingly, he is a supervisor under the applicable laws.  Further, he is an employer under the applicable State Laws.  Tringali was aware of and remained deliberately indifferent to the unlawful conduct as set forth herein.

11. Defendant Andrew Kalos ("Kalos"), upon information and belief, was and remains a resident of the County of Suffolk, State of New York.  Kalos was and is an Inspector in the Department.  As Inspector, Kalos has final authority to assign work responsibilities, bring disciplinary charges, transfer employees, and set policies.  Accordingly, he is a supervisor under the applicable laws.  Further, he is an employer under the applicable State Laws.  Kalos was aware of and remained deliberately indifferent to the unlawful conduct as set forth herein.

## FACTS

12. On September 6, 2016, Beth was hired to work as a police officer for the College's University Police Department.

13. Throughout her employment, Beth was subjected to gender discrimination and retaliation – some instances of which are listed below.

14. In April 2017, during Beth's first week of employment, a male officer, later identified as Tringali, placed an unprofessional note in her mailbox counseling Beth about fueling police vehicles, even though she had not been shown the gas pumps yet.  George Sarantakis (an officer who graduated from the academy with Beth) did not receive a similar note.

15. Lee regularly belittled female officers Valerie Ashton and Julie Donley in front of Beth. He called them "emotional" and "indecisive" and said they would never be promoted.  As noted below, he later used those words to describe women generally, which informed Beth's

4

understanding of Lee's frequent use of those terms directed towards women. He did not use those terms to describe men.

16. Lee would randomly insult women without prompt. Derogatory gender-based comments, like these and others detailed below, were made by Lee approximately once a week while Beth worked with Lee from approximately 2017-21.

17. Even when Beth did not work directly with Lee, Beth would hear these comments during daily "tour change" and on other occasions. She also heard gender-based comments from others, many of which are detailed below.

18. Lee did not use similar language to describe the males and did not similarly insult males without justification. Further, Lee rarely, if ever, gave positive feedback or reinforcement to the female officers, which he often provided to male officers.

19. Chief Daugherty and other supervisors were aware of Lee's behavior and did nothing about it.

20. Also, from approximately 2017-21, Beth was continuously interrupted when responding to dispatch calls, even when she was the lead officer. It was common practice within the department that lead officers take the lead on calls and remain uninterrupted until they are finished. She was interrupted by Officers Tringali, Ronald Quaranta ("Quaranta") (subsequently promoted to Lieutenant), Matthew Hess ("Hess"), and Joseph Tucker ("Tucker") (subsequently

5

promoted to Lieutenant).  When male officers were leads on calls, they were not interrupted.

21. In December 2018, Beth required administrative access to a computer program. As Lee was the supervisor to address the situation, Beth emailed him.  Lee responded by scolding her for emailing him so late.  Beth reported this to her union representative, Officer Andrew Sousa ("Sousa"), who told Lee his response was unacceptable.

22. In around Spring 2019, as Beth became eligible to take the Lieutenants' exam, Lee told her she would never be promoted because women are emotional and indecisive.  He frequently made similar derogatory comments about women.

23. Male Officer Quaranta called a female officer (believed to be Officer Adrian Jordan) a "bitch" and he referred to Officer Dorthey Criscolo as "bi-polar."  He made the "bitch" comment in the presence of Lieutenant Julie Donnelly and another officer.  At the time, Quaranta was not rebuked for this comment.  As discussed later, Beth advanced formal complaints of discrimination to human resources ("HR") which resulted in Quaranta's later discipline.  However, had there been proper training, he would not have used these terms and/or supervisors would have known to discipline him for using those terms.  Supervisors' acceptance of comments like these allowed the gender-based hostility to flourish.

24. It was common practice among male officers to comment on female officer's personal lives, relationship status, and use of maternity leave.  For example:

a.  In 2018, when Beth was pregnant, Officer Tringali and Officer Quaranta said on separate occasions and multiple times, words to the effect of, "this is what women do, they get pregnant and go out."

b.  When Officer Adrian Jordan transferred to the Department in around 2019-20, similar comments were made and officers said that she did not want to work and would just get pregnant and go out.

c.  When Officer Danielle Walter was hired in around 2021, male officers made comments about her boyfriend and whether she was going to get engaged and get pregnant.

d.  When Officer Jasmin Ramos transferred to the Department while pregnant (in about 2023-24), male officers made comments about when she would take leave, frequently saying that she came to the job just to take leave.

25. These comments and other similar comments were regularly made at pre-shift briefings where supervisors were present.  The comments were accepted and did not elicit rebuke.

26. In 2018, while Beth was pregnant and recovering from a cesarian section, Tringali and Lee spoke critically of Beth in front of her peers, questioning her tactics and judgment. At this time, Beth was the only female officer in the Department and comments of this nature were not made about male officers. Officer Eddie Witkowski also made similar comments before he left the Department.

27. In July 2021, a promotional exam for lieutenant was cancelled due to Covid.  This

permitted supervisors to appoint people to these positions instead of using the civil service list which was typically used to determine promotions.

28. Chiefs Capezza and Daugherty appointed Officers Tucker and Sousa to the two open lieutenant positions.

29. Tucker had less experience and less seniority on the job than Beth. Tucker also had a prior disciplinary incident.

30. Tucker told Beth that he knows that she was upset, but she will have to report to him now. Beth noted that she had two more years on the job than he had, and she should have gotten the position. Tucker's response was to say that her time was insignificant because she was out on maternity leave.

31. In July 2021, Capezza told Beth that Tucker was promoted instead of her because he had more training than Beth. Beth responded that Capezza gave all the training opportunities to the guys, even when they had less seniority.

32. Male officers often spoke to the female secretarial staff that worked in the traffic department with disdain and disrespect.

33. On August 9, 2021, Lieutenant Tucker inappropriately counseled Beth regarding incomplete paperwork that was the responsibility of the 'Officer in Charge' that day, which

happened to be Officer Luis Llano ("Llano"), not Beth. Llano had substantially more time on the job than Beth and when Beth told Tucker that it was Llano's responsibility, he responded that it didn't matter. Tucker did not counsel Llano about the incident.

34. On September 29, 2021, in front of Beth, both Chiefs, multiple lieutenants, and the public, during the response to a hit and run, Officer Hess yelled "take it deep" as a double entendre referencing fellatio. Beth complained about the offensive comment to Quaranta and Lieutenant Donley, both of whom heard the comment. Hess was not counseled regarding this inappropriate gender-based comment.

35. In November 2021, Hess referred to female officer Adrienne Jordon as a "bitch" and the n-word. Lieutenant Donley witnessed this and did not offer any rebuke. Beth complained to Donley immediately who downplayed it saying that he really didn't mean it.

36. On December 1, 2021, during an all-hands-on-deck campus event where a large uncooperative crowd was expected, Capezza repeatedly ordered Beth to address multiple incidents, while male officers stood idle and were not assigned similar tasks.

37. On February 3, 2022, Detective Hauff told Beth that Chief Dougherty said that he would never promote Beth.

38. On February 8, 2022, Capezza and Tucker singled out Beth in front of her peers because she and Officer Seamus Kirby parked on the side of headquarters. Kirby received no discipline.

This area was often used for parking by male officers, who experienced no repercussions.

39. On February 11, 2022, Beth was venting to Llano about Tucker's promotion, in response Llano said, "didn't they do that to Julie and Valerie too" and said everyone knew they did not consider females as candidates.

40. On March 21, 2022, Beth complained to HR about gender discrimination, triggering an informal complaint process.

41. On March 26, 2022, Affirmative Action Officer Aqueelah Speakes ("Speakes") gave Beth a Charge of Discrimination form which Beth signed. The Complaint named Chief Daugherty and Assistant Chief Capezza as respondents.

42. Speakes asked Beth to provide a document outlining the facts that relate to her complaint. On March 31, 2022, Beth sent Speakes an email with an attachment setting forth the facts relating to her complaint.

43. HR appears to have deemed the complaint formally filed on April 4, 2022.

44. In the first week of April, Beth's complaint was provided to Chief Daugherty and Assistant Chief Capezza.

45. Speakes reformatted Beth's email into a document which summarized her gender-

based complaints – that document was dated April 8, 2022, and signed by Beth on May 16, 2022.

46. On April 13, 2022, Capezza filed a detailed written response to Beth's complaint, and Chief Daugherty filed his response on April 15, 2022.

47. To discredit Beth, retaliate against her, and to create a pretext to take retaliatory adverse action against her, the College began searching for conduct for which to discipline Beth. The only conduct they could uncover was from a surveillance video over nine months old (August 20, 2021), which the College claimed showed Beth's children in the officer's break room alone in the presence of Beth's duty belt, which securely held her service weapon and other police related items.

48. In April 2022, the scores for the lieutenant civil service examination were announced. Beth was the only woman eligible for the position.

49. Neither Tucker, nor Sousa, scored in the top three. Had they scored in the top three, they would have immediately been given the position as they were already working in the position in an interim capacity.

50. Beth was told that the Chiefs said they would not consider her for the position.

51. Tringali had the highest score on the exam, Beth scored second highest, and Quaranta scored the fourth highest.

52. After the results were released, Tringali and Quaranta were promoted to the two open Lieutenants positions. Tucker and Sousa were removed from the positions as they could not be reached on the civil service list. Tringali was promoted despite previously failing a lie detector test that precluded him from obtaining employment with other law enforcement entities.

53. On May 9, 2022, Detective Hauff hand-delivered a letter to Beth's home advising her that she was placed on "alternate assignment" which was a paid suspension. The letter also prohibited her from entering the premises of the College.

54. On May 27, 2022, Beth was served with a notice that there was evidence indicating that she "may have committed acts for which formal disciplinary action may be initiated against her" for "bringing [her] children to campus on or about August 20, 2021, and endangering their welfare while they were on campus." The letter directed Beth to report for an interrogation on June 2, 2022.

55. On May 28, 2022, Beth received a Memorandum from Speakes regarding the outcome of the HR investigation, which stated that Speakes had concluded that Beth's complaint of discrimination was not substantiated by the evidence, but without offering any substantive detail.

56. On June 1, 2022, Mary Beth McCloskey (Director of HR) and Jessica Durso (Assistant Director of HR) conducted a retaliatory interrogation, wherein Beth admitted that on August 20, 2021, she brought her three children to the station at the start of her shift because her husband,

who is an NYPD officer, was late returning home from his shift. The College alluded through questioning that Beth took off her utility belt and left it in the room with her children.

57. During the interrogation, the College revealed that it intended to suspend Beth without pay. Beth's union, the Police Benevolent Association ("PBA") delegate argued that the College did not genuinely believe that Beth put her children at risk given that the College, as a mandatory reporting agency, did not report the incident to Child Protective Services ("CPS").

58. By letter dated June 2, 2022, the College suspended Beth, without pay, pending a hearing.  The letter indicated that Beth would be sent a notice of discipline ("NOD") withing seven days, containing the charges and the proposed penalty. The letter also said that she was prohibited from entering the College campus.

59. On June 3, 2022, the College reported Beth to the New York Statewide Central Resister of Child Abuse and Maltreatment alleging that Beth abused or maltreated her children.

60. On or about June 6, 2022, Beth received a letter from CPS advising her that there was a report alleging that Beth abused or maltreated her children. The letter informed Beth that CPS would be investigating the allegations.

61. By letter dated June 9, 2022, the College served Beth with a NOD alleging that on August 20, 2021, Beth allegedly took off her duty belt while her children were sleeping in the break room and left the room. The Notice of Discipline indicated that the penalty sought was

termination.

62. By separate letter also dated June 9, 2022, Beth was served with an amended letter of suspension which also referred to the August 20, 2021, alleged occurrence.

63. The charges were couched as criminal infractions by alleging the conduct was "likely to be injurious to the physical welfare of a child less than 17 years old," which enabled the College to circumvent the time limitation, which would have precluded these stale charges.

64. Shortly after Beth left her children to sleep in the break room, Beth's husband picked up the children. There is no allegation and certainly no proof that the children were conscious while in the room or that they had access to the duty belt. Also, the duty belt has a double retention holster, which is designed to make the weapon exceptionally difficult to access, and even more difficult for a child to access. Further, as Beth and her husband are both officers, their children were meticulously taught not to touch any of their parents' work-related equipment. Despite these mitigating circumstances, and the fact Beth has no prior acts of misconduct in her six years of service, the penalty sought was termination of employment. Further as noted below, CPS exonerated Beth of endangering or mistreating her children.

65. On June 10, 2022, the PBA filed a disciplinary grievance challenging the discipline.

66. On June 14, 2022, the PBA sent a letter to the arbitrator charged with deciding the NOD, arguing that the suspension did not meet the contractual standard for an unpaid suspension

because Beth did not pose a threat to people and property and her continued employment did not interfere with the College's operations.

67. On June 15, 2022, while Beth was not earning any income, she sent an email to the Chief (cc to HR) with an outside employment request form to the Chief seeking to work as "Accounting/Office Management." As this clearly did not present any danger or conflict of interest, the form could have been approved forthwith but was ignored for approximately 10 days.

68. On June 16, 2022, the arbitrator, after hearing arguments from the parties, determined that there was no probable cause to believe that Beth's "continued presence on the job represent[ed] a potential danger to persons or property or would severely interfere with its operations."

69. On June 28, 2022, the arbitrator ruled that the College's suspension of Beth without pay was unwarranted and ordered that she be restored to payroll and that any leave credits that were used during her suspension be restored. Five days of personal leave was not restored.

70. On July 21, 2022, CPS sent a letter to Beth advising her that "CPS did an investigation and decided the report was unfounded." This means CPS did not find a fair preponderance of the evidence that the child(ren) were abused or maltreated."[1]

---

[1] CPS had broad authority to take action if they found that Beth was a threat to her children:

1. (a) Pursuant to the requirements and provisions of the family court act, a peace officer, acting pursuant to his or her special duties, a police officer, a law enforcement official, or a designated employee of a city or county department of social services... shall...when

71. On August 23, 2022, Beth filed a complaint with the New York State Department of Human Rights ("SDHR"), alleging sex-based discrimination and retaliation.

72. In early November 2022, knowing the disciplinary proceeding was entirely without merit, the Department withdrew the proceeding, immediately preceding the start of the arbitration and after making substantial efforts to pressure Beth to accept formal discipline instead of proceeding.

73. By letter and email dated On November 7, 2022, HR advised Beth that her "alternative duty assignment will end on November 8, 2022." She was directed to return to her normal schedule on November 9, 2022. She returned on that date after being forced to remain home with possible termination hanging over her head for approximately six months.

74. On February 16, 2023, the College filed its position statement with the SDHR, claiming it did not engage in any discriminatory or retaliatory practices. The Department, in part, defended itself by claiming there was no adverse employment action because the arbitration "was withdrawn and a non-disciplinary counseling memo" was issued. The College withdrew the NOD only to avoid losing arbitration and permit itself to make this argument. However, Beth was not paid

---

appropriate, [take] or [keep] a child in protective custody without the consent of a parent or guardian if such person has reasonable cause to believe that the circumstances or condition of the child are such that continuing in his or her place of residence or in the care and custody of the parent, guardian, custodian or other person responsible for the child's care presents an imminent danger to the child's life or health.

Social Services Law § 417.

during her unpaid suspension. Even though backpay was later provided that did not relieve Beth of the hardship of not receiving her paycheck, being precluded from working her chosen profession, enduring the stress of possible termination and the possibility that her children could have been removed from her custody given the CPS report.

75. On March 22, 2023, Beth submitted her rebuttal to the position statement.

76. In April 2023, Beth was skipped for a promotion to the role of Detective. Beth's score on the state civil service detective examination was in the top three in the Department and she received a perfect score on the county examination, which was the highest county score within the County. In contrast to a police officer position, a detective position would have paid a substantially higher salary, allowed for Beth to make her own hours and permitted Beth to wear plain clothes as opposed to heavy officer gear.

77. Prior to working with the Department, Beth was an Investigative Auditor at the New York State Attorney General's office for seven years, specializing in forensic accounting.

78. In the past, Beth interviewed for the position of Investigator at the Suffolk County Board of Ethics and the Suffolk County District Attorney's Office, and received job offers from both.

79. Despite Beth's experience and qualifications, Officer Matthew Fitzharris, was promoted. While Beth had similar time on the job as Fitzharris, he scored lower on the state test

than Beth, did not take the County test, and had no prior investigative experience.

80. On April 22, 2023, Officer Llano asked Beth to swap cars. Beth did so, and then went to physical training ("PT"). It is Department policy not to drive marked cars to PT. Officer Llano (male officer who did not engage in protected activities) had been driving a marked vehicle, and without realizing, Beth had driven Officer Llano's marked vehicle to PT. When Lt. Tringali observed Beth driving a marked vehicle, he publicly berated her. Later that day, Beth spoke about what had happened to Officer Llano, who told Beth he had made the same mistake the week before (i.e., driving a marked vehicle to PT), and Lt. Tringali's only response was to calmly tell him words to the effect of "don't be that guy that ruins the [PT] policy for everyone." Officer Llano was not berated, nor was he confronted publicly.

81. On May 7, 2023, Beth received a counseling memo stating she had violated the UPD's PT policy twice.

    a.   The first violation was alleged to have occurred on May 1, 2023, when Beth called out for PT at 9:10a.m. PT policy states that two officers may not call out for PT at the same time. The counseling memo alleges that Officer Llano did not report back from his PT break until 9:23a.m., and that by calling out prior to Officer Llano reporting back for duty, Beth had caused two officers to be out for PT at the same time. However, Beth observed Officer Llano return to headquarters before calling out for PT.

    b.   The second alleged violation occurred on May 2, 2023. Beth called out for PT over the radio and was at the gym when Kalos (then a Lieutenant) radioed her, telling her to get

in uniform and report back to headquarters immediately. Beth complied, and when she returned to headquarters, she discovered that Kalos had left before her return which resulted in a violation of the policy that two officers must always be designated as road units. Kalos' early departure while Beth was at the gym meant that Beth's unit would not have two road units. However, no one in Beth's unit was informed that Kalos would be leaving early. The officer in charge (at the time Officer Llano) did not even know he would be officer in charge until after Kalos left.

82. Pursuant to the counseling memorandum, Beth's PT privileges were suspended for three months. Lieutenant Kalos was not held accountable for leaving early without informing anyone, nor did he receive a counseling memorandum. He was later promoted to Inspector.

83. Additionally, pursuant to the Collective Bargaining Agreement, counseling memoranda is supposed to be a way to provide corrective feedback and is not supposed to be disciplinary. However, Beth was punished by having her PT privileges removed for three months, without being given a corrective opportunity.

84. On May 25, 2023, the SDHR found probable cause existed to believe that the Department engaged in or was engaging in unlawful discriminatory practices. The SDHR found:

a. The investigation further revealed that the subject matter of the NOD (Notice of Discipline) – that complainant had brought her children to work, removed her duty belt containing lethal and non-lethal weapons, and left it in a room with her unsupervised children – indisputably only came to light after she filed an internal complaint.

19

b.  Respondent was unaware of the incident until nearly nine months later – and only then learned of it, in essence, by accident – yet not only suspended complainant, but also presented the incident as a criminal matter so as to be able to pursue substantive disciplinary action (termination) against her.

c.  Respondent contends the decision (to withdraw the NOD) was made after considering the 'totality of the circumstances to date.' But a review of those very circumstances finds no change occurred at any point during the time between when the NOD seeking termination was first issued and when complainant ultimately received a counseling memo in its place.

d.  Significantly, the only change would appear to be complainant's filing of this instant complaint.

85. On June 3, 2023, Beth received a counseling memorandum, claiming she had violated policy regarding vehicle use, specifically failing to disclose damage to her vehicle. However, the memo stated that "[Beth] reported to Lieutenant Capezza that there may have been damage to vehicle 390 that occurred while responding to a fire alarm call at Hale Hall." The memo classifies the damage to the vehicle as "obvious." However, when Beth visited the garage to ask about the damage to her vehicle, John Vasta, the head mechanic, responded, "what damage?" and said that he had told "Andrew" (which could have been Sousa or Kalos) that there was no damage, even when the car was lifted on jacks.

86. After the June 3 incident, Beth was assigned the worst car in the fleet until she took an emergency vehicle operations course ("EVOC").  This is not standard procedure, but when Beth

questioned the practice, the response was "well, that's what Suffolk PD does." Further, the Department took over seven months to get Beth the EVOC training.

87. On November 3, 2023, Beth received yet another counseling memorandum which alleged that:

a. Beth failed to inspect her vehicle and failed to properly inspect the firearm in the vehicle. Beth works night shifts with the UPD and received permission from Lieutenant Donley to inspect her vehicle in a better lit area, because the area outside headquarters was too dark to properly inspect a vehicle. Despite permission from her direct supervisor to conduct the inspection elsewhere on campus, Lieutenant Tringali counseled Beth without speaking to Lieutenant Donley.

b. Beth violated Department policy, because when she returned to headquarters and her weapon was returned to the armory, a live round was found in the chamber of the rifle that had been in Beth's vehicle. When questioned about it, Beth explained that she could not have been the one to put a round in the chamber because when conducting her weapons inspection, she did not pull the trigger of her weapon because it was late at night, dark, and she wanted to exercise caution when inspecting the weapon. Furthermore, the firearms policy 306.5(c) states that: "Members shall not clean, repair, load or unload a firearm anywhere in the Department, except where clearing barrels are present." No clearing barrels were present, as Beth was inspecting her weapon in a parking lot. After counseling her for her conduct, the Department corrected the inconsistency in the policy and changed it to be consistent with what Beth was doing.

21

88. In November 2023, Officer Walter was sent to an Instructor Development Course ("IDC") training instead of Beth. In the position statement submitted to the SDHR, the Department claimed that Chief Daugherty stated that Complainant was "told that when the next offering of the class is available she will be able to attend." Not only did the department not send Beth, but no one informed her that she would not be sent. Beth learned that she had not been selected for IDC training only because Officer Walter mentioned it to her. Officer Walter never engaged in protected activities.

89. On November 20, 2023, Beth requested a meeting with her PBA representative and newly appointed Inspector Kalos to discuss Lieutenant Tringali's behavior, including the meritless counseling meetings and the fact that no effort had been made to send Beth to the EVOC remedial training. During the meeting, Beth specifically complained that she was being retaliated against for her complaints.

90. In January 2024, Beth was finally sent to EVOC training, seven months after the June 3 incident.

91. On February 10, 2024, Beth was returning from working an on-campus event. Lieutenant Tringali told her she had not followed overtime pay protocol because she had not received a briefing from him prior to her leaving for the event. However, Lieutenant Tringali's comments were contradicted by a memo issued by Chief Daugherty on January 9, 2024, stating that pre-shift briefing for overtime pay is no longer protocol. Also, Beth made her presence known

22

when she received equipment from the Lieutenant's office where he was located. Beth remained in headquarters for another half an hour before leaving for the event, leaving ample time for Tringali to brief Beth. Tringali did not brief Beth, nor did he even speak to her while she was in headquarters.

92. On March 24, 2024, Beth was scheduled to work a baseball game on campus from 11:00 a.m. to 5:00 p.m. The baseball game ended at 4:00 p.m., and Beth returned to headquarters to finish the last hour of her shift. At approximately 4:25 p.m., Lieutenant Tringali entered headquarters and told Beth to clock out at 4:30 p.m.  Beth stated that she was scheduled to work until 5:00 p.m., and she was receiving overtime for her shift. Beth requested that she be allowed to finish the last half hour of her shift. She stated that she had work to do, but Tringali refused to allow her to finish, telling her to do whatever work she would have done on her normal tour. Beth said, "fine, goodbye." Upon hearing this, Lieutenant Tringali became angry and began yelling claiming Beth was rude and insubordinate. He was so animated that he made Officer Grimes visibly uncomfortable.

93. On March 25, 2024, Beth had called Inspector Kalos about the incident that occurred the day before. She voiced her frustration with Tringali's ongoing poor treatment of her and raised the fact that Tringali has consistently arrived later than what the pre-shift briefing protocols dictate. Beth again complained about Tringali's ongoing mistreatment.

94. On March 29, 2024, Beth emailed Inspector Kalos detailing the incident and describing it as part of a "hostile work environment" where he used "personal bias" to determine who will

earn overtime.

95. On April 1, 2024, Detective Fitzharris quit his detective job which left an opening. Beth interviewed for the position again. At this point, Beth was number one on the civil service list within the department. Beth was not promoted. In the eight years Beth worked at the Department, every promotion was given to someone within the Department. This time, a male officer, was hired from outside the Department.

96. On June 16, 2024, Beth volunteered to work overtime for an event was under the supervision of Lieutenant Tringali. Beth and Officer Criscuolo were assigned to work traffic patrol at a parking lot and, after the lot emptied, patrol all fields. Lt. Tringali later admonished Beth for patrolling the other fields. Lieutenant Tringali also accused Beth of not calling back into service after meal, however, Beth called back into service approximately 30 minutes after her meal. This is on a recorded radio transmission. Lt. Tringali would ask Beth questions and then speak over her. Tringali gave Beth a public verbal discipline in front of hundreds of patrons despite Beth having followed his orders.

97. Later that day, on June 16, 2024, Beth summitted a form complaining about the above incident. She indicated that Lieutenant Tringali was harassing her and intimidating her and "creating a hostile uncomfortable work environment" adding that Tringali has been "targeting [her] for over a year."

98. On June 19, 2024, Inspector Kalos issued a counseling memorandum claiming Beth

24

was insubordinate in her interactions with Tringali on March 24, 2024.

99. On or about June 21, 2024 Beth was upset at work and told Lieutenant Donley that all the retaliation by management coupled with the way management permitted Lieutenant Tringali to target her caused Beth to have her first ever panic attack. To prevent Beth from having one at work, Lieutenant Donley made Beth take a walk. During the walk, Beth expressed her concerns, including those cited above, told Donley that ever since her complaint, management has been retaliatory and is ignoring inappropriate behavior by other Lieutenants. Lieutenant Donley told Beth to stay strong, calm down and that she doesn't operate like that.

100.    On July 20, 2020, at approximately 1:30 a.m. while conducting a patrol of the interior of campus, Beth accidentally ran over a tree stump. Beth reported this to Lieutenant Donley. Although there is no policy stating that the incident must be documented, Donley instructed Beth to document the incident and state that Donley personally checked the vehicle and there was no damage.

101.    On August 12, 2023, Beth was notified by PBA representative Chris Lacosse that she was going to be interrogated regarding the incident relating to patrolling the interior of the campus.

102.    Fellow Officer James Sullivan was questioned by HR as he was present on July 20, 2024, he stated that he regularly patrols the interior of campus.

25

103.    However, current and former officers Steven Beckwith, Robert Gulick, Andrew Sousa, Lieutenant, Donley, Lieutenant Quaranta, Patrick Lentini, Matthew Fitsharris, Matthew Hess, Inspector Kalos, Lieutenant Lee, Lieutenant Capezza, Lieutenant Tringali, Joseph Tucker, James Sullivan and Chief Daughter among others have all consistently driven on the interior of the campus and parked on walkways during non-emergency calls and routine patrols.

104.    When Beth asked about the order in 2017, Lieutenant Lee advised Beth that the order was meant for day tours 7:00 a.m. to 3:00p.m. as there was a high volume of student pedestrian traffic.  Lee told Beth that the order did not apply to the evening patrol, and this was common evening tour practice.  Further, there was a June 8, 2022 notification from Lieutenant Tucker directing Officers to patrol the interior of campus for personal and construction vehicles.

105.    Beth eventually, under pressure, signed an agreement stating that three days of vacation accruals shall be held in abeyance for one year and a permanent letter of reprimand would be placed in her personnel file.

## **CLAIMS FOR RELIEF**

## **SECTION 1983 CLAIMS**

106.    The basis for Plaintiff's Section 1983 claims is limited to acts occurring within three years of the filing date of this complaint, and other conduct described herein is related to other claims and/or included as relevant background.

107.    Defendants Daugherty and Capezza, under color of state law, altered Plaintiff's terms, conditions and privileges of employment, in violation of the Fourteenth Amendment of the United States Constitution (as enforced by 42 U.S.C. § 1983) by subjecting her to gender discrimination and retaliation and/or by failing to remedy the unconstitutional conduct of which they were aware.

108.    The College Defendant is subject to <u>Monell</u> liability because the College maintained a policy, practice or custom, whereby it committed, condoned, and/or remained deliberately indifferent to the aforementioned constitutional violations, which may be inferred in the following ways:

    a.  The College maintained a custom or practice of discriminating and retaliating against Plaintiff. The unlawful practices were so persistent and widespread that they constitute actual and/or constructive acquiescence of policymakers.

    b.  The College's high-level supervisors and/or persons responsible for preventing Constitutional violations took the unconstitutional actions and/or failed to properly investigate, prevent, remedy, or correct the unlawful conduct.

    c.  Inadequate training/supervision was so likely to result in discrimination and/or retaliation that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

    d.  Policymakers participated in and/or knew of and failed to correct the unlawful conduct.

## **TITLE VII AND NYSHRL CLAIMS**

109.    As set forth above, Defendant College subjected Plaintiff to discrimination and retaliation in violation of Title VII and the NYSHRL, on the basis of her gender, and her opposition to discriminatory practices.

27

110.    Plaintiff's Title VII claims are only asserted against the College, not the Individual Defendants.  Further, Title VII claims are brought only for claims that accrued within 300 days of the dual filing of the Charge of Discrimination with the EEOC and the NYS Division of Human Rights which was filed on August 23, 2022.  The New York State Human Rights Law claims are brought only for claims which occurred within three years of the August 23, 2022 filing date.

111.    The Individual Defendants, aided, abetted, incited, compelled, coerced and/or condoned the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law § 296(6), NYSHRL, by participating in and/or being aware of such conduct and failing to remediate same.

**WHEREFORE**, Plaintiff demands judgment against Defendants, where applicable, for all compensatory, emotional, physical, and punitive damages, any lost pay, front pay, injunctive relief, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.  Plaintiff demands a trial by jury.

Dated: Carle Place, New York
        January __, 2024

LEEDS BROWN LAW, P.C.

*Attorneys for Plaintiff*
One Old Country Road, Ste. 347
Carle Place, New York 11514
(516) 873-9550

_____/s/_____

RICK OSTROVE
BRANDON OKANO